OPINION
{¶ 1} Defendant-appellant Victor Turner appeals from his conviction in the Mahoning County Common Pleas Court for aggravated robbery. Turner raises a number of issues in this appeal. First, this court must decide whether Turner's constitutional and statutory right to a speedy trial was violated. Second, this court must decide whether the conviction was against the manifest weight of the evidence and/or the state provided insufficient evidence to sustain the conviction. Third, whether prosecutorial misconduct occurred. Fourth, whether potential jurors were wrongfully excluded based upon their race. Lastly, this court must decide whether the length of this appeal has resulted in a due process violation. For the reasons stated below, the judgment of the trial court is hereby affirmed.
 STATEMENT OF FACTS {¶ 2} On September 27, 1991, two men, one armed with a sawed-off shotgun, robbed The Medicine Shoppe pharmacy located in Mahoning County, Ohio. The man with the sawed-off shotgun was identified as Turner; the unarmed accomplice was identified as Ray Sadler. (Tr. 129, 159).
 {¶ 3} Working in the pharmacy that day was Jennifer Benedict, John Paul Chiasson, and Bob Yane, the pharmacist. (Tr. 99, 102, 120-121). The two men approached the cash register where all three employees were situated. The armed man instructed Yane to get him drugs from the cabinet behind the register. Benedict and Chiasson were instructed to lie face down and their hands were tied behind their backs by the unarmed man. The two men additionally instructed Yane to empty the cash register and the safe that was located in the back room; Yane complied with the instruction. (Tr. 209-211). Yane was then instructed to lie face down and his hands were also tied behind his back. (Tr. 211). The drugs taken from the store were Percocet, Percodan, Oxycodone, Tylox, Dilaudid, Tylenol No. 3, Vicodin, and sleeping pills. (Tr. 214).
 {¶ 4} During the course of the robbery, five customers came into the store. The first two customers were Kathleen Knutti and her father Martin Chismar. Upon entering the store, they were instructed by the two men to go to the back of the room and lie face down on the floor. (Tr. 151). The unarmed man tied their hands behind their backs and took Knutti's red change purse, which contained a little over $35. (Tr. 156).
 {¶ 5} The next customer was Alan Devault. (Tr. 306). Upon entering the pharmacy, he noticed no one was there, but he heard yelling coming from the back of the store. (Tr. 307). He explained that he started to understand what was going on, so he ran out of the store despite someone telling him to stop. (Tr. 307). He proceeded to go across the road to the hardware store and phoned the police. (Tr. 207).
 {¶ 6} Deborah Pascarella then entered the store. (Tr. 174). The armed man put the gun in her back, instructed her to go to the back of the room, and demanded that she give him any money that she had. (Tr. 174). She gave him a Mahoning National Bank envelope that contained approximately $160 and another $50 in cash. (Tr. 175). She was then ordered to lie on the floor with her face down and her hands were tied behind her back. (Tr. 177).
 {¶ 7} The last customer was Albert Stizza. (Stizza Videotaped Depo. 7). Upon entering the store, the armed man stuck the sawed-off shotgun to Stizza's head, instructed him to go to the back of the store, and to give him any money he had. (Stizza Videotaped Depo. 8-9). Stizza gave him a Federal Iron Works envelope that contained $664. (Stizza Videotaped Depo. 10). Stizza was then instructed to lie down and the unarmed man tied him up with a cord. (Stizza Videotaped Depo. 11).
 {¶ 8} The two men then left the pharmacy; Devault observed this by watching from the hardware store. (Tr. 309). He saw them pull out from behind the store in a brown car. (Tr. 310). The police then arrived and Devault informed them that the robbers were in a brown car and indicated the direction the brown car was traveling. (Tr. 310).
 {¶ 9} A short pursuit ensued involving several police vehicles and the brown vehicle. The pursuit ended when the brown car crashed into a police cruiser. Sadler immediately exited the car and fled on foot, however, an officer caught him. Turner remained in the driver's seat and was forcibly removed from the car when he failed to cooperate with instructions.
 {¶ 10} The officers conducted an inventory search of the vehicle and found a sawed-off shotgun and prescription drugs. On Turner's person the officers recovered two envelopes, one Mahoning National Bank envelope containing $162.79 and one Federal Iron Works envelope containing $664.
 {¶ 11} Turner was arrested and subsequently indicted on four counts of aggravated robbery with firearm and prior conviction specifications on all counts. On May 11, 1993, the case proceeded to a jury trial. Turner was found guilty on all four counts of aggravated robbery, the firearm specifications, and prior conviction specifications. Turner was sentenced to 10 to 25 years on each of the four counts of aggravated robbery. The trial court further ordered that each sentence was to be served consecutively to one another and consecutively to one three-year firearm specification.
 {¶ 12} Turner filed a timely notice of appeal on May 19, 1993. Appellate counsel, Attorney Jan Mostov, was appointed by the trial court on June 14, 1993. On July 14, 1995, Turner was granted leave to file a brief by August 23, 1995. On September 20, 1995, Attorney Mostov moved to withdraw as counsel referencing irreconcilable differences between him and Turner.
 {¶ 13} The motion was granted and Attorney Maureen Sweeney was appointed to represent Turner on September 27, 1995. Turner was granted leave to file a brief by December 17, 1995. Turner was granted a second leave to file a brief by February 5, 1996. On May 8, 1996, this court granted final leave to file a brief by June 7, 1996. However, on May 15, 1996, Attorney Sweeney moved to withdraw.
 {¶ 14} On September 19, 1996, we granted Attorney Sweeney's motion to withdraw and appointed Attorney Miles to represent Turner. In a journal entry dated May 12, 1998, we stated that the brief was to be filed by June 1, 1998. On May 29, 1998, Attorney Miles filed a motion claiming that our May 12, 1998 journal entry was his first notice of his appointment to the case. He explained that the appointment journal entry was mistakenly sent to an attorney by a similar name in Dayton, Ohio, and therefore, he would need additional time to the file a brief. On June 4, 1998, we granted Turner final leave to file a brief by July 10, 1998. On October 26, 1998, we then issued another journal entry requiring a brief to be filed by November 20, 1998. Once again, on March 8, 1999, we issued a journal entry requiring a brief to be filed by March 24, 1999, or the appeal would be dismissed. On August 16, 2000, the state moved to dismiss the appeal for lack of prosecution. On February 12, 2001, we dismissed the appeal for lack of prosecution.
 {¶ 15} On March 12, 2001, Turner, through Attorney Miles, moved to reinstate the appeal. Attorney Miles also requested to withdraw as counsel. Two years later, on March 18, 2003, we granted Turner's request and reopened the appeal. We also granted Attorney Miles' request and allowed him to withdraw from the case. We then named the Ohio Public Defender as counsel for Turner. However, within a month the Ohio Public Defender moved to withdraw as counsel. We granted that request and immediately appointed Attorney Finucane to represent Turner.
 {¶ 16} Turner's brief was filed on June 17, 2003, after Attorney Finucane filed one motion for extension of time. The state's brief was then filed on October 1, 2003.
 ASSIGNMENTS OF ERROR NUMBERS TWO AND THREE {¶ 17} "The defendant-appellant is entitled to a reversal of his convictions because he was not brought to trial within the time permitted by R.C. sec. [sic] 2945.71 et. seq."
 {¶ 18} "Defendant-appellant's rights to a speedy trial under the Sixth Amendment to the United States Constitution AND Section10, Article I of the ohio constitution have been violated."
 {¶ 19} In the second and third assignments of error, Turner argues his statutory and constitutional right to a speedy trial was violated. Due to the commonality of these assignments of error they will be addressed together.
 {¶ 20} R.C. 2945.71 et seq. states that a felony defendant must be brought to trial within 270 days of arrest or within 90 days if the defendant is held in jail in lieu of bail on the pending charge. Each day an accused is held in jail in lieu of bail on the pending charge is generally counted as three days (triple count provision). R.C. 2945.71(E). However, the triple count provision is applicable only to those defendants held in jail in lieu of bail solely on the pending charges. State v.Brown, 64 Ohio St.3d 476, 479, 1992-Ohio-96; State v. Cook
(1992), 65 Ohio St.3d 516, 518. See, also, State v. Martin
(1978), 56 Ohio St.2d 207. If the accused is also being held for separate offenses, which includes parole and probation violations, the triple count provision is inapplicable for as long as those additional charges are pending. State v. Dunkins
(1983), 10 Ohio App.3d 72, 74-75. Furthermore, the time which an accused must be brought to trial may be tolled for "any period of delay necessitated by reasons of a plea in bar or abatement, motion, proceeding or action made or instituted by the accused." R.C. 2945.72(E).
 {¶ 21} Turner claims that he was not brought to trial within the prescribed 270 days. The state contends that due to the number of motions Turner filed, which are tolled against him, he was brought to trial within 270 days.
 {¶ 22} Turner was arrested on September 27, 1991; his trial began on May 11, 1993. This is 592 days after his arrest. Turner contends that after tolling the time that is attributable to him, the state brought him to trial 310 days after his arrest. The state contends that after tolling the attributable time to Turner, it brought him to trial in 195 days.
 {¶ 23} Turner was arrested on September 27, 1991. The time for speedy trial begins to run when an accused is arrested; however, the actual day of arrest is not counted. State v.Szorady, 9th Dist. No. 02CA008159, 2003-Ohio-2716, at ¶ 12. At the time of his arrest he was held in jail in lieu of bond solely on the pending charge. However, three days later on September 30, 1991, a parole hold was placed on him. As stated above, when the accused is also being held for separate offenses, which included parole holders, the triple count provision is inapplicable for as long as those additional charges are pending. Therefore, the triple count provision applies to September 28 and September 29, 1991. However, since the parole hold was placed in effect on September 30, 1991, the triple count provision does not apply to that day or any day following since the parole hold remained in affect through the trial. See State v. Evans (Sept. 15, 1998), 5th Dist. No. 96CA31-2. Therefore, September 28 and September 29 count as six days.
 {¶ 24} From the time of his arrest until October 30, 1991, Turner did not file any motions. On October 30, 1991, Turner filed various motions requesting discovery, bill of particulars, and a preliminary hearing. He contends that these motions are not chargeable against him because the motions did not actually cause delay. The determination is not whether the motion caused a delay but rather whether the motion tolls the speedy trial time. The Ohio Supreme Court has held that "[a] demand for discovery or a bill of particulars is a tolling event pursuant to R.C.2945.72(E)." State v. Brown, 98 Ohio St.3d 121, 2002-Ohio-7040, syllabus. Thus, Turner's conclusion that the October 30, 1991 motions do not toll the speedy trial time is incorrect. Therefore, from September 30, 1991 to October 30, 1991, 30 days are chargeable to the state.
 {¶ 25} The speedy trial time did not begin to run again until the state's responses to the motions. The responses were filed on November 12, 1991. On November 27, 1991, Turner filed a motion to withdraw his previous not guilty plea, requested treatment in lieu of conviction and a continuance of all further proceedings. Thus, the November 27, 1991 motions tolled the speedy trial time.State v. Pickens (Sept. 18, 1998), 6th Dist. E-98-005 (stating that the motion to stay proceedings pending the outcome of a hearing for treatment in lieu of conviction tolls the speedy trial statute). The time from November 12, 1991 to November 27, 1991, 15 days, is chargeable to the state.
 {¶ 26} The hearing on the motion for treatment in lieu of conviction was held on February 14, 1992. Therefore, the time period from November 27, 1991 to February 14, 1992, is chargeable to Turner. Id. Trial was then set for February 26, 1992. However, on February 18, 1992, Turner filed a motion for continuance, which was granted and began to toll the speedy trial time. Therefore, from February 14 to February 18, the speedy trial time was not tolled and four days are counted against the state.
 {¶ 27} The trial was then reset for April 22, 1992, however, on April 21, 1992, the state filed a motion to continue the trial because a witness was unavailable. The court granted the motion and reset the trial for June 17, 1992. Prior to trial, on May 12, 1992, Turner filed a motion to dismiss based on speedy trial violations. This type of motion tolls the speedy trial time.State v. Bickerstaff (1984), 10 Ohio St.3d 62, 67 ("It is evident from a reading of [R.C. 2945.72(E)] that a motion to dismiss acts to toll the time in which a defendant must be brought to trial."); State v. Bunyan (1988),51 Ohio App.3d 190, 193. Therefore, from April 21, 1992 until May 12, 1992, the speedy trial time was not tolled and, thus, 21 days are counted against the state.
 {¶ 28} On June 4, 1992, the trial court overruled the motion to dismiss. The date from the filing of the motion to dismiss until the trial court ruled on the motion tolled the speedy trial date. State v. Hughes, 9th Dist. No. 02CA008206, 2003-Ohio-5045, at ¶ 15. On June 17, 1992, Turner requested a continuance, which as stated before, tolls the speedy trial time. Thus, from June 4 until June 17, 13 days elapsed that are chargeable to the state.
 {¶ 29} The trial was then reset for September 21, 1992.[1] On that date, Turner entered a plea of not guilty by reason of insanity. The court then appointed the Forensic Psychiatric Center to examine him and to file a report within 30 days. Thus, the trial was continued for 45 days, resetting trial for November 4, 1992.
 {¶ 30} However, on October 29, 1992, Turner requested a continuance until the report by the Forensic Psychiatric Center was completed. Regardless of the continuance, the plea of not guilty by reason of insanity tolled operation of the speedy trial statute until resolution of that issue. R.C. 2945.72(B) and (E).
 {¶ 31} The sanity hearing was held on December 30, 1992, however, at that time, Turner requested a continuance so that an examiner could be brought in for cross-examination. Thus, the hearing was reset. On February 3, 1993, the trial court made the determination that the issue of Turner's not guilty by reason of insanity plea needed no pretrial and, thus, due to the crowded docket of the court, it reset the trial for April of 1993.
 {¶ 32} Turner argues that the time period from September 21, 1992 until February 3, 1993, should count towards the state in determining speedy trial time. Turner reasons that since the trial court eventually concluded that the sanity issue did not need to be determined in a pretrial, the period of time from the not guilty by reason of insanity plea to the trial court's conclusion that a pretrial hearing was not necessary, is attributable to the court, and not chargeable to him for speedy trial purposes. While it is true that the trial court came to that conclusion, Turner disregards the fact that during the time period in question, he asked for two continuances which are chargeable to him. As such, the time period from September 21, 1992 until February 3, 1993, tolls the speedy trial time.
 {¶ 33} Thus, speedy trial time began to run on February 4, 1993. The trial began on May 11, 1993. This amounts to an elapse of 98 days.
 {¶ 34} Adding together all the days that are attributable to the state and the court, 187 days elapsed. As such, given that Turner was also being held on the parole holder, he was brought to trial within the statutorily mandated 270 days.
 {¶ 35} Having found that Turner's statutory right to a speedy trial was not violated, we must next address whether his constitutional right to a speedy trial was violated. In Barkerv. Wingo (1972), 407 U.S. 514, 530, the United States Supreme Court set fourth four factors to consider when evaluating whether an appellant's right to a speedy trial was violated: (1) whether the delay before trial was uncommonly long; (2) whether the government or the criminal defendant is more to blame for the delay; (3) whether in due course, the defendant asserted his right to a speedy trial; and (4) whether he suffered prejudice as a result of the delay.
 {¶ 36} The first factor is whether the delay was uncommonly long. Id. A delay of more than one year is generally considered presumptively prejudicial. Doggett v. United States (1992),505 U.S. 647, 652. In this matter, the delay was about one and a half years. Therefore, the first factor is met. Once this factor is met, Barker instructs that the above four factors must be weighed to determine whether the delay violated the right of an accused to a speedy trial.
 {¶ 37} Regarding the second factor, i.e. who is more to blame for the delay, this factor weighs against Turner. As explained under the above analysis of whether Turner's statutory right to a speedy trial was violated, much of the delay is attributable to Turner through the numerous continuances and motions he and his counsel filed.
 {¶ 38} The third factor, whether Turner asserted his right to a speedy trial, does weigh in his favor. Turner filed two motions to dismiss based on speedy trial violations, one by counsel and one pro se. This was an adequate assertion of his right.
 {¶ 39} The fourth factor, whether Turner suffered prejudice from the delay, weighs in favor of the state. Turner argues that since the delay was so long, it must be presumed that he suffered prejudice. The Sixth Circuit has stated that the longer the delay is traceable to the state, the more prejudice will be presumed.Wilson v. Mitchell (C.A. 6, 2001), 250 F.3d 388, 396. However, in the case at hand, a large amount of the delay is not traceable to the state; rather it is traceable to Turner. Therefore, any prejudice he suffered was a result of his own actions.
 {¶ 40} Thus, weighing all of these factors together, we reach the conclusion that Turner's constitutional right to a speedy trial was not violated. The arguments made under these assignments of error are without merit.
 ASSIGNMENT OF ERROR NUMBER FOUR {¶ 41} "Insufficient evidence exists to support the defendant-appellant's convictions and/or the verdict is against the manifest weight of the evidence; further, the trial was rendered fundamentally unfair, under the Fourteenth Amendment to the United States Constitution and Article One, Section 16 of the Ohio Constitution, by breaks in the chain of evidence, missing evidence and failure of eyewitnesses to adequately and/or consistently identify the defendant-appellant."
 {¶ 42} Under this assignment of error, Turner contends that the evidence was insufficient to support the jury verdict, that the jury verdict was against the manifest weight of the evidence, and that there were breaks in the chain of evidence, thus making the evidence unreliable and not supporting the conviction. Each argument will be addressed separately.
 SUFFICIENCY OF THE EVIDENCE {¶ 43} Sufficiency of the evidence and weight of the evidence are distinct concepts with different definitions and different tests. State v. Thompkins, 78 Ohio St.3d 380, 387,1997-Ohio-52. Sufficiency of the state's evidence is a question of the adequacy of that evidence. Id. at 386. In determining this question of law, we view the evidence in the light most favorable to the prosecution and determine whether any rational fact finder could find the essential elements proven beyond a reasonable doubt. Id.; State v. Goff, 82 Ohio St.3d 123, 128, 1998-Ohio-369.
 {¶ 44} Turner was convicted of aggravated robbery in violation of R.C. 2911.01 with firearm specifications in violation of R.C. 2041.145. The elements of aggravated robbery are that an offender had a deadly weapon on or about his person or under his control and either displayed, brandished, indicated that he possessed it or used the weapon while committing, attempting to commit, or fleeing immediately after committing or attempting to commit a theft offense. R.C. 2911.01. The elements of a firearm specification are that while committing the underlying felony offense the offender had on or about his person a firearm that was a deadly weapon and was capable of expelling one or more projectiles by the action of an explosive or combustible propellant. R.C. 2041.145.
 {¶ 45} In viewing the evidence in the light most favorable to the state, any rational fact finder could find the essential elements of aggravated robbery proven beyond a reasonable doubt. Chiasson, Benedict, and Yane testified that the Medicine Shoppe was robbed by two men, and one of the men was armed with a sawed-off shotgun. (Tr. 102, 121-123, 209-214). Turner was identified by Benedict and Knutti as the man with the gun. (Tr. 129-130, 159, 163). Pascarella testified that the two men took from her a Mahoning National Bank envelope containing approximately $160 and another $50 in cash. (Tr. 175). Stizza testified that he was instructed by the armed man to give him his money; Stizza gave him a Federal Iron Works envelope which contained $664. (Stizza Videotaped Depo. 10). The Federal Iron Works and Mahoning National Bank envelopes were on Turner's person at the time of the arrest. Thus, the testimony was sufficient to establish that Turner committed a theft offense with a firearm in Mahoning County.
 {¶ 46} Turner contends that the eyewitness identification was insufficient to establish that he was the armed man who committed the offense. Out of the seven witnesses, only two, Knutti and Benedict, were able to identify him as the armed man. (Tr. 129-130, 159, 163). Benedict stated that she first identified Turner at the preliminary hearing. (Tr. 130). She stated that her identification was based upon his scruffy facial hair. (Tr. 129). Knutti stated that she could identify Turner because she remembered his eyes. (Tr. 163). However, some witnesses' testified that the armed man was wearing dark glasses at the time of the robbery. Regardless, when viewing the evidence in the light most favorable to the prosecution, the identifications were sufficient to sustain the conviction. Thus, sufficient evidence was presented to allow a reasonable trier of fact to determine that Turner committed the aggravated robbery.
 {¶ 47} Additionally, sufficient evidence was presented to prove the firearm specification. As stated above, sufficient evidence was provided to prove that Turner committed the underlying felony offense and that he had in his possession at the time a sawed-off shotgun. Officer Ciavarella, an officer from the Crime Lab who performed a test-fire on the shotgun, testified that the sawed-off shotgun that was removed from the front seat of the car driven by Turner was operable. (Tr. 262). Thus, the sufficiency of the evidence argument is without merit.
 MANIFEST WEIGHT OF THE EVIDENCE {¶ 48} Weight of the evidence concerns the greater amount of credible evidence to support one side over the other.Thompkins, 78 Ohio St.3d at 387. It indicates clearly to the trier of fact that the state is entitled to a conviction if, on weighing the evidence, the trier of fact finds that the greater amount of credible evidence sustains the issue to be established. Id. "Weight is not a question of mathematics, but depends on its effect in inducing belief." Id.
 {¶ 49} The reviewing court examines the entire record, weighs the evidence and all reasonable inferences, considers the credibility of witnesses, and determines whether in resolving conflicts in the evidence, the trier of fact clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered. Id. The appellate court's discretionary power to grant a new trial on these grounds should be exercised only in the exceptional case where the evidence weighs heavily against the conviction. Id.
 {¶ 50} This strict test acknowledges that credibility is generally the province of the trier of fact, who sits in the best position to assess the weight of the evidence and credibility of the witnesses, whose gestures, voice inflections, and demeanor the trier of fact can personally observe. State v. DeHass
(1967), 10 Ohio St.2d 230, 231. See, also, Seasons Coal Co. v.Cleveland (1984), 10 Ohio St.3d 77, 80. Where there are two fairly reasonable views or explanations, we do not choose which one we prefer. Rather, we defer to the trier of fact unless the evidence weighs so heavily against conviction that we are compelled to intervene. In arguing that the conviction is against the manifest weight of the evidence, Turner relies on witness identification, or lack thereof, and his own version of the events that transpired at the Medicine Shoppe.
 {¶ 51} As stated above, only Benedict and Knutti identified Turner. Knutti's identification relied on remembering Turner's eyes, even though other witnesses testified that the armed man wore dark glasses. Benedict's identification was first made when she attended the preliminary hearing and was based upon his scruffy face.
 {¶ 52} The dark glasses testimony from other witnesses may call into question Knutti's identification; however, Benedict still identified Turner. Furthermore, it was up to the jury to decide whether to believe the witnesses' identification. Even if it could be stated that these two witnesses' identifications were unreliable, other evidence connected Turner to the crime. He was the driver of the get away car. Moreover, when he was arrested, two envelopes were found on his person, one from Federal Iron Works and one from Mahoning National Bank. Additionally, a sawed-off shotgun was found in the front seat. Furthermore, Turner admitted being addicted to opiates. (Tr. 336). The drugs stolen from the pharmacy were opiate-based drugs. Thus, any discrepancies in the eyewitness identification does not render the verdict as being against the manifest weight of the evidence.
 {¶ 53} Next, Turner argues he never went into the Medicine Shoppe. He claims that the only reason he was in Sadler's car was because he flagged Sadler down for a ride home. (Tr. 338). He contends that he did not know Sadler was going to the pharmacy and that there was another individual in the car with them. (Tr. 340, 342). Turner then claims that after Sadler and this unnamed individual left the drug store, Sadler instructed Turner to drive the car and the unnamed individual left the area on foot. (Tr. 343-345). Thus, Turner contends he had nothing to do with robbery.
 {¶ 54} Despite his contention and his version of the events on the day of the crime, it was for the jury to decide which version to believe. As stated above, when there are two views or explanations of an event, we do not choose which one we prefer, rather, we defer to the trier of fact unless the evidence weighs so heavily against the conviction. In this situation, the evidence does not weigh heavily against the conviction and, thus, we cannot conclude that the jury clearly lost its way. As such, this argument fails.
 BREAKS IN THE CHAIN OF EVIDENCE AND MISSING EVIDENCE {¶ 55} The red change purse and the money inside it, the money inside the Mahoning National Bank envelope, and the money from the pharmacy were missing at the time of trial. Also, the evidence tag was missing from the sawed-off shotgun. However, the Federal Iron Works envelope and money, the sawed-off shotgun, and the Mahoning National Bank envelope were not missing.
 {¶ 56} Any break in the chain of custody goes to the credibility, or weight of the evidence, and not to admissibility.State v. Barzacchine (1994), 96 Ohio App.3d 440. Therefore, Tuner's arguments regarding the missing evidence and breaks in the chain of evidence is reviewed under a manifest weight of the evidence analysis.
 {¶ 57} The missing evidence tag from the sawed-off shotgun does not render the verdict against the weight of the evidence. The shotgun was the evidence, not the evidence tag. Furthermore, the officer who removed it from the car identified it at trial as the shotgun removed from the car Turner was driving. (Tr. 182, 258). Moreover, witnesses testified that it was or looked like the shotgun used at the pharmacy. (Tr. 130, 159).
 {¶ 58} The missing money from the Mahoning National Bank envelope while disturbing, is also harmless. The Mahoning National Bank envelope was available for trial. Pascarella testified that the two men took from her a Mahoning National Bank envelope containing approximately $160. (Tr. 175). An officer testified that this envelope was removed from Turner's person at the time of the arrest. (Tr. 232). Therefore, the testimony established what was inside the envelope and that Turner had this envelope.
 {¶ 59} Likewise, the missing red change purse and the money inside it does not affect the verdict. Knutti testified that the unarmed man, Sadler, took this from her. An officer testified that it was removed from the car driven by Turner and Sadler. (Tr. 226). Therefore, while it is also disturbing that this money is missing, it does not affect the conviction.
 {¶ 60} Moreover, the fact that the evidence was missing was disclosed to both Turner and the jury. The jury was free to weigh any of the evidence problems and determine how it affected the elements of the offense. As stated above, we must defer to the conclusion reached by the jury unless the evidence weighs heavily against the conviction. The problems with the evidence, though disturbing, do not weigh heavily against the conviction especially since witness testimony corroborated what the missing items were. Therefore, this argument also fails.
 ASSIGNMENT OF ERROR NUMBER FIVE {¶ 61} "Prosecutorial misconduct deprived the defendant of a fundamentally fair trial which he is entitled to under theFourteenth Amendment to the United States Constitution and Article One, Section 16 of the Ohio Constitution."
 {¶ 62} In arguing that certain comments amount to prosecutorial misconduct, Turner must demonstrate that the remarks were improper and that the remarks prejudicially affected his substantial rights. State v. Treesh, 90 Ohio St.3d 460,461, 2001-Ohio-4. A reviewing court must evaluate the remarks in the context of the entire trial. Id. We focus on the fairness of the trial, not the culpability of the prosecutor. State v.Jones, 90 Ohio St.3d 403, 420, 2000-Ohio-187.
 {¶ 63} Turner contends that the following colloquy amounts to prosecutorial misconduct:
 {¶ 64} "Q. What are you on probation for?
 {¶ 65} "A. I'm on probation for robbery. That was a theft.
 {¶ 66} "Q. What kind of a — what kind of robbery?
 {¶ 67} "A. Actually, to be perfectly frank —
 {¶ 68} "Q. No —
 {¶ 69} "A. — it was a theft.
 {¶ 70} "Q. You're on probation for Aggravated Robbery from November? You were placed on probation in November of 1990, is that correct, for an Aggravated Robbery?
 {¶ 71} "A. For a theft that was turned into a robbery that I was forced to plead to if I wanted to go to the Halfway House.
 {¶ 72} "Q. And didn't you have a gun in that one, too?
 {¶ 73} "A. I didn't have a gun, Mr. Pochiro.
 {¶ 74} "Q. Well, was it an Aggravated Robbery?
 {¶ 75} "A. Yeah.
 {¶ 76} "Q. I handled that case, Victor.
 {¶ 77} "A. I'm not being smart with you, Mr. Pochiro.
 {¶ 78} "Q. Well, don't try to buffalo anybody. I handled that case.
 {¶ 79} "Mr. Zena: Objection, Your Honor.
 {¶ 80} "Q. I know the facts about that case. It was an aggravated robbery that you're on probation for today.
 {¶ 81} "Mr. Zena: Objection, Your Honor?
 {¶ 82} "A. It's a theft, Mr. Pochiro.
 {¶ 83} "Q. It's an aggravated robbery.
 {¶ 84} "A. That's what I pled to, yes, sir.
 {¶ 85} "Q. You're on probation for that; right?
 {¶ 86} "A. Yes." (Tr. 361-362).
 {¶ 87} Turner argues that Mr. Pochiro's exploration into the underlying facts of his prior conviction amounted to the prosecutorial misconduct, especially given the fact that the prosecutor announced that he was the prosecutor in the prior aggravated robbery case. Turner claims this resulted in a denial of his right to a fair trial because the jury would believe what the prosecutor said without any evidence supporting the statement.
 {¶ 88} When an accused testifies at trial, Evid.R. 609 allows the state to impeach his credibility with evidence of prior felony convictions. State v. Hughes, 8th Dist. No. 81768, 2003-Ohio-2307. Furthermore, Evid.R. 609(A)(3) allows evidence regarding a witness's conviction of any crime if the crime involves dishonesty. A theft offense, including aggravated robbery, is a crime involving dishonesty. Id. As such, the prosecutor was permitted to question Turner regarding his prior conviction for aggravated robbery.
 {¶ 89} The prosecutor's questioning as to the details of the prior conviction went to Turner's credibility since he pled to aggravated robbery (which indicates that a deadly weapon or a dangerous ordnance was on his person or that he inflicted or attempted to inflict serious harm on another), but was classifying the offense for the jury as a theft. Theft and aggravated robbery are two separate distinct offenses. Classifying an aggravated robbery as theft takes away the implication that a deadly weapon, dangerous ordnance, or infliction of harm was used in the commission of the offense. In the state's supplement to the record, it is clear that the prior conviction for aggravated robbery contained a gun specification. Therefore, the questioning did go to credibility.
 {¶ 90} However, at the point the prosecutor stated that he knew the facts of the prior conviction because he was the prosecutor in that case, he may have been overstepping his bounds since he was coming very close to acting as a witness. Regardless, viewing the entire testimony as a whole, the gist of the prosecutor's conduct was to impeach the credibility of Turner. When Turner denied that a gun was used, the prosecutor was trying to further impeach his credibility by showing that he pled to aggravated robbery with a gun specification, which is an admission that a gun was used. Therefore, the prosecutor's conduct did not amount to prosecutorial misconduct.
 {¶ 91} Even if the prosecutor did overstep his bounds, the alleged incidents of prosecutorial misconduct were not sufficient to deprive Turner of a fair trial, particularly given the strength of the evidence against him. Under the circumstances, any alleged prosecutorial misconduct did not deprive Turner of his substantial rights. See State v. Lott (1990),51 Ohio St.3d 160, 165; State v. Hirsch (1998), 129 Ohio App.3d 294, 309-310. Accordingly, this assignment of error is overruled.
 ASSIGNMENT OF ERROR NUMBER SIX {¶ 92} "Racial discrimination during the jury selection violated defendant-appellant's rights under theFourteenth Amendment to the United States Constitution and Article I, Section 2 of the Ohio Constitution."
 {¶ 93} Turner argues that the state improperly removed potential juror Cohen and potential juror Blackshear from the jury based upon their race. Each potential juror will be addressed separately.
 POTENTIAL JUROR COHEN {¶ 94} The state challenged for cause potential juror Cohen. Based upon that challenge, the trial court excused her. Defense counsel did not object to her removal, thus, the argument that the removal for cause was based upon her race is waived, absent plain error. State v. Lewis, 67 Ohio St.3d 200, 1993-Ohio-181
(stating a failure to object in the trial court to the claimed error waives that objection, absent plain error). Plain error has been defined as, "an obvious error which is prejudicial to an accused, although neither objected to nor affirmatively waived, which, if allowed to stand, would have a substantial adverse impact on the integrity of and public confidence in judicial proceedings." State v. Craft (1977), 52 Ohio App.2d 1, paragraph one of the syllabus.
 {¶ 95} A juror who has been challenged for cause is excused if the court has any doubt as to the juror being entirely unbiased. State v. Cornwell, 86 Ohio St.3d 560, 563,1999-Ohio-125. Good cause exists for the removal of a prospective juror when "he discloses by his answers that he cannot be a fair and impartial juror or will not follow the law as given to him by the court." R.C. 2313.42(J). A juror "* * * ought not to suffer a challenge for cause when the court is satisfied from an examination of the prospective juror or from other evidence that the prospective juror will render an impartial verdict according to the law and the evidence submitted to the jury at the trial."State v. Duerr (1982), 8 Ohio App.3d 404, paragraph two of the syllabus.
 {¶ 96} Cohen's son was involved in a vehicular homicide and was prosecuted and convicted. (Tr. 41). Attorney Zena, who was defense counsel in the present case, prosecuted Cohen's son. (Tr. 43). The court found that the connection between potential juror Cohen and defense counsel, along with the feelings that may be resurrected through the trial, was a sufficient justification for granting the prosecutor's challenge for cause. (Tr. 42-43). Furthermore, Turner agreed with the removal. (Tr. 146-147). Given the reasoning and the plain error standard of review, the trial court committed no error when it removed potential juror Cohen based upon the state's challenge for cause.
 POTENTIAL JUROR BLACKSHEAR {¶ 97} The state exercised its right to a peremptory challenge against potential juror Blackshear. (Tr. 144). Defense counsel objected. The trial court overruled the objection and excused potential juror Blackshear. Turner argues that this was an error because the challenge was based upon potential juror Blackshear's race.
 {¶ 98} A prosecutor is ordinarily entitled to exercise peremptory challenges for any reason at all, so long as it is related to the prosecutor's view concerning the outcome of the case to be tried. However, the Equal Protection Clause of theFourteenth Amendment forbids the prosecutor from challenging potential jurors on account of their race. Batson v. Kentucky
(1986), 476 U.S. 79, 89. The Ohio Supreme Court summarized the three-prong Batson test as follows:
 {¶ 99} "First, a party opposing a peremptory challenge must demonstrate a prima-facie case of racial discrimination in the use of the strike. To establish a prima-facie case, a litigant must show he or she is a member of a cognizable racial group and that the peremptory challenge will remove a member of the litigant's race from the venire. The peremptory-challenge opponent is entitled to rely on the fact that the strike is an inherently `discriminating' device, permitting `those to discriminate who are of a mind to discriminate.' The litigant must then show an inference or inferences of racial discrimination by the striking party. The trial court should consider all relevant circumstances in determining whether a prima-facie case exists, including statements by counsel exercising the peremptory challenge, counsel's questions during voir dire, and whether a pattern of strikes against minority venire members is present.
 {¶ 100} "Assuming a prima-facie case exists, the striking party must then articulate a race-neutral explanation `related to the particular case to be tried.' A simple affirmation of general good faith will not suffice. However, the explanation `need not rise to the level justifying exercise of a challenge for cause.' The critical issue is whether discriminatory intent is inherent in counsel's explanation for use of the strike; intent is present if the explanation is merely a pretext for exclusion based on race.
 {¶ 101} "Last, the trial court must determine whether the party opposing the peremptory strike has proved purposeful discrimination. It is at this stage that the persuasiveness, and credibility, of the justification offered by the striking party becomes relevant. The critical question, which the trial judge must resolve, is whether counsel's race-neutral explanation should be believed." Hicks v. Westinghouse Materials Co.,78 Ohio St.3d 95, 98, 1997-Ohio-227 (internal citations omitted).
 {¶ 102} Turner established a prima facie case of discrimination with the removal of potential juror Blackshear. The record reveals that Turner is an African American and that Blackshear is an African American. Also, it appears there is an inference of racial discrimination because potential juror Cohen, an African American, was removed for cause (though this was proper), and then potential juror Blackshear, an African American, was removed. This left only one African American on the jury.
 {¶ 103} Thus, having met the threshold burden, the burden then shifted to the state to provide a race-neutral explanation. The state argued that race was not a determination in excusing potential juror Blackshear. The state contended that potential juror Blackshear glared at him in a way that showed hostility towards him. (Tr. 149). The state then went on to claim that on the questionnaire provided to potential juror Blackshear, she stated that she had one daughter, but when asked by the prosecutor how many daughters she had, she informed him that she had two daughters. (Tr. 150-151). Last, the state argued that when the jurors were asked whether "any members of their families had been involved where a prosecutor was on the opposite side of their interest," Blackshear did not indicate that her nephew (whom she stated she was not close to) had previously been convicted of trafficking drugs. (Tr. 150). The state contended that taking all of these factors into consideration left him with "an uneasy feeling of leaving her on" the panel. (Tr. 151). Thus, the state met its burden to provide a race-neutral explanation for the dismissal.
 {¶ 104} After providing a race-neutral explanation, the court was then required to consider whether it believed that explanation. The court overruled the objection. (Tr. 153).
 {¶ 105} The trial court did not err in allowing the peremptory challenge to potential juror Blackshear. Her lack of candor about the number of daughters she has and about her nephew, were sufficient justification for her removal. Furthermore, the prosecutor's belief that potential juror Blackshear glared at him in a way to make him feel hostility was also a sufficient reason to justify a peremptory challenge. Even a silly or superstitious reason, or mere hunch, which on its face is race-neutral, will satisfy the state's burden of producing a race-neutral reason for the peremptory challenge, if believed by the trial court. Purkett v. Elem (1995), 514 U.S. 765, 769. Accordingly, this assignment of error lacks merit.
 ASSIGNMENT OF ERROR NUMBER ONE {¶ 106} "Defendant-Appellant was denied his right to a speedy appeal in violation of the Fourteenth Amendment to the United States Constitution and Article I, Section 6 of the Ohio Constitution and was denied the effective assistance of appellate counsel in violation of the Sixth Amendment to the United States Constitution and Article I, section 10 of the Ohio Constitution, having been forced, due to his indigency, to wait over ten years to have this appeal brief filed on his behalf."
 {¶ 107} Turner argues that it violated his due process rights (right to effective assistance of appellate counsel) for this appeal to have taken ten years (almost 11) to be briefed and decided. The state initially argues that there is no authority to suggest that a claim of ineffective assistance of appellate counsel is cognizable on direct appeal. The state argues that Turner can cite to nothing in the record that justifies this assignment of error. The state contends that the actions Turner complains of occurred after this court received jurisdiction and, therefore, according to it, any errors that occurred are not a part of the record on appeal.
 {¶ 108} While the state is correct that any of the errors alleged under this assignment of error did occur after we obtained jurisdiction, that does not automatically make them outside the record of our review. The error that is alleged here occurred within our own appellate record. This is not the situation where an appellant is arguing that some error occurred at the trial court that is not in the record. In that situation, we could not review the alleged error because it is outside the record and there is nothing more than appellant's mere allegation for us to review. However, here, the alleged error is in our appellate record, which as shown below is well documented and reviewable. Additionally, other courts have reviewed this type of error on direct appeal. State v. Hammon (Oct. 5, 2001), 6th Dist. No. E-97-129; Perdue v. Kentucky (Ky., 2002),82 S.W.3d 909; Colorado v. Rios (Colo.App., 2001), 43 P.3d 726;Washington v. Lennon (1999), 94 Wash.App. 573; Washington v.Hargrove (2000), 2000 Wn. App. LEXIS 97. Absent from these opinions is any discussion as to whether the delay in the appeal can be raised in the direct appeal. Thus, given that there is a reviewable record, the issue of whether the delay in the appeal violated an appellant's due process right is a cognizable claim on direct appeal.
 {¶ 109} The United States Court of Appeals for the Sixth Circuit and the Ohio Sixth Appellate District have acknowledged that the Due Process Clause affords an appellant "a minimum expectation of a reasonably timely appeal." United States v.Smith (C.A. 6, 1996), 94 F.3d 204, 206-207, citing Harris v.Champion (C.A. 10, 1994), 15 F.3d 1538, 1558; Simmons v.Reynolds (C.A. 2, 1990), 898 F.2d 865, 868. See, also, Hammon, 6th Dist. No. E-97-129. "In so holding, these courts have first recognized that there is no due process right to an appeal at all, but that an appeal must nonetheless comport with due process `if a State has created appellate courts as "an integral part"' of its criminal justice system." Smith, 94 F.3d at 207
(internal citation omitted).
 {¶ 110} To determine whether an inordinate delay denies due process, courts have adopted a modified version of the test formulated in Barker. Id. The four-prong test enunciated inBarker examines the length of delay, the reason for the delay, the defendant's assertion of his right and the prejudice to the defendant. Id., citing Barker, 407 U.S. at 530. "The length of the delay acts as a triggering mechanism, meaning that unless the delay is unreasonable under the circumstances, there is no necessity to inquire further." Lennon, 94 Wash.App. at 578, citing Doggett, 505 U.S. at 651. In extreme circumstances, the length of the delay may give rise to a strong "presumption of evidentiary prejudice." Smith, 94 F.3d at 209, citingDoggett, 505 U.S. at 655-657.
 {¶ 111} However, in State v. Dumas, 7th Dist. No. 98 CA 167, 2002-Ohio-6614, at ¶ 50, we specifically stated, "[U]nless and until such a right [right to a speedy appeal] is specifically articulated by the Ohio Supreme Court, we decline to construe a speedy appeal right exists." Yet, we went through the analysis of the modified Barker test to fashion a remedy for Dumas. Id. at ¶ 50. We stated that given the fact that Dumas had served all but a couple months of his sentence and given that we found that his plea should have been vacated and the cause remanded, we dismissed the charges. Id. The reasons for the dismissal was based upon Dumas having practically served out his entire five-year sentence and, thus, he would have been severely hampered by withdrawing his plea. Id. We explained that the prosecutor would have no incentive to renegotiate a plea because Dumas had already served the plea bargained sentence. Id. The prosecutor, we reasoned, would only have an incentive to bring the case to trial hoping to obtain a longer prison term. Id. Furthermore, we stated in that case that it was an extraordinary remedy and "was the appropriate course of action in this matter pursuant to his second assignment of error [regarding whether the plea should be vacated]." Id. In effect, we found that Dumas
was prejudiced by the delay in the appeal because had the appeal not been delayed, the conviction would have been reversed and instruction given to the trial court to withdraw the guilty plea. Id. at ¶ 58.
 {¶ 112} The case at hand is distinguishable from Dumas. As explained under the above assignments of error, there are no meritorious issues on appeal. As such, we are not in a position that requires us to fashion a remedy that is appropriate for the situation. Therefore, as we still are not recognizing a right to a speedy appeal, we do not need to address the factors in the modified Barker test. Thus, the issue raised under this assignment of error is without merit. However, even if we were to recognize a right to a speedy appeal, this argument would still fail as Turner is unable to meet all of the modified Barker
test elements.
 {¶ 113} The first modified Barker test factor is the length of the delay. In the case at hand, the appeal was filed in May of 1993 and the briefs were not filed until June and October of 2003, thus the length of the delay is over 10 years. This delay cannot be characterized as anything but unreasonable. As stated in Smith, "An appeal that needlessly takes ten years to adjudicate is undoubtedly of little use to a defendant who has been wrongly incarcerated on a ten-year sentence." Smith,94 F.3d at 208. Therefore, the remaining three factors in the modified Barker test must be examined.
 {¶ 114} The second Barker factor is the reason for the delay. Turner argues that the reason for the delay is not attributable to him, but rather is attributable to the state and ineffective court-appointed counsel. While the state agrees that some of the blame is attributable to it, it contends that the majority of the blame lies with Turner and possibly with this court.
 {¶ 115} It took about nine months for the transcripts to be filed. From the time those transcripts were filed until the first attorney withdrew due to irreconcilable differences was approximately 17 months. The second attorney was immediately appointed. This attorney lasted about nine months before moving to withdraw due to irreconcilable differences. Both attorneys filed for extensions of time, however, it does not appear that they were trying to delay the appeal.
 {¶ 116} It took four months for this court to appoint the third attorney. After appointing this attorney, the case remained inactive for approximately 20 months. This court then issued a journal entry directing a brief to be filed. The third attorney then filed a motion stating that he had no idea he was appointed because the journal entry appointing him was sent to an attorney by a similar name in Dayton, Ohio. The third attorney then asked for an extension to file the brief.
 {¶ 117} After the third attorney was put on notice that he was in fact the attorney in this case, he did not file anything, despite repeated entries by this court that if a brief was not filed the appeal would be dismissed. After appellant failed to file anything for 22 months, the state moved to dismiss, which was subsequently granted. One month after the appeal was dismissed, Turner moved to reinstate the appeal. However, this court did not rule on the motion to reinstate for two years, which was then granted.
 {¶ 118} Within four months of reinstatement, new counsel was appointed and Turner's brief was filed. Within three months of Turner's brief being filed, the state filed its brief.
 {¶ 119} The 17 months for the first attorney, the nine months for the second attorney, and the eight months for the last attorney are not unreasonable lengths of time for an attorney to work on this type of appeal. Therefore, this time is attributable to Turner.
 {¶ 120} However, that said, the two-year delay from the withdrawal of the second counsel to the third counsel's actual notice that he was appointed as counsel was a technical innocent mistake. Despite the innocence of the mistake, this delay is attributable to this court and the state. Failures of court-appointed counsel and delays by the court are attributable to the state. Coe v. Thurman (C.A. 9, 1990), 922 F.2d 528, 531. Furthermore, the state concedes that the 22-month delay from when the third attorney knew he was representing Turner until the state filed its motion to dismiss is attributable to it. Id. Additionally, the two years it took our court to rule on the motion to reinstate is not attributable to Turner, but rather is attributable to this court. Therefore, it appears that roughly 5 1/2 years are attributable to the state and/or this court.
 {¶ 121} Barker stated, "Different weights should be assigned to different reasons":
 {¶ 122} "A deliberate attempt to delay the trial in order to hamper the defense should be weighed heavily against the government. A more neutral reason such as negligence or overcrowded courts should be weighed less heavily but nevertheless should be considered since the ultimate responsibility for such circumstances must rest with the government rather than with the defendant. Finally, a valid reason, such as a missing witness, should serve to justify appropriate delay." Barker, 407 U.S. at 531 (citation omitted).
 {¶ 123} Consequently, it appears that this factor weighs in favor of Turner.
 {¶ 124} The third Baker factor is whether appellant asserted his right to a speedy trial. The state concedes that this factor weighs in favor of Turner. The appellate docket does reveal that Turner made a couple of handwritten letters/motions to this court. Therefore, it appears that Turner was dissatisfied with the pace of the appeal. Thus, this factor weighs in Turner's favor.
 {¶ 125} The fourth Baker factor is prejudice. "Prejudice is to be assessed in light of the interest that the right to a speedy disposition of an appeal is intended to protect." Dumas,
2002-Ohio-6614. These interests are: (1) preventing oppressive incarceration pending appeal, (2) minimizing anxiety and concern of the convicted party awaiting the outcome of the appeal, and (3) limiting the possibility that the grounds for appeal or defenses might be impaired in the cases where the conviction is reversed and remanded for retrial. Smith, 94 F.3d at 207;United States v. Hawkins (C.A. 8, 1995), 78 F.3d 348, 351.
 {¶ 126} Turner makes no arguments under any of these three sub-factors, instead he argues that since the delay was so long, prejudice must be presumed. Courts have stated the length of the delay may give rise to a strong "presumption of evidentiary prejudice." Smith, 94 F.3d at 209, citing Doggett,505 U.S. at 655-657. The language that a lengthy delay gives rise to a strong presumption implies that the state could rebut that presumption by showing that the above mentioned three sub-factors do not apply to appellant.
 {¶ 127} Regarding the first sub-factor, in Hawkins, the Eighth Circuit stated that a defendant cannot show that his incarceration was oppressive if he was rightfully incarcerated and, thus, the court turned to the merits of the appeal.Hawkins, 78 F.3d at 351. See, also, Rios, 43 P.3d at 733. Also, a Washington Court of Appeals case stated that an appellant needs to show more than the fact that he had served almost the entire amount of sentence or all of his sentence before the appeal was heard to show that the incarceration was oppressive.Lennon, 94 Wash.App. at 579. That court reasoned that appellant had already stood trial and was found guilty, therefore, he was in a different situation than a defendant arguing violation of speedy trial rights. Id. The court went on to state that incarceration during the appeal does not require the same degree of consideration as the Sixth Amendment imposes on the period between arrest and trial. Id. Therefore, since Turner's arguments on appeal are not meritorious then prejudice is not shown. (See preceding assignments of error for merits of appeal).
 {¶ 128} Regarding the second prejudice consideration, anxiety and concern of the convicted awaiting the outcome of his appeal, no argument was made concerning this factor. Therefore, we will not presume that there was any more than the normal amount of anxiety and concern over his appeal.
 {¶ 129} The last sub-factor is limiting the possibility that a convicted person's grounds for appeal and his defenses are impaired where the merits of the appeal support a reversal and remand for retrial. This factor has been characterized as the most serious factor in analyzing prejudice. Barker,407 U.S. at 532; Harris, 15 F.3d at 1563. This factor like the first sub-factor appears to go to the merits of the appeal. An unsuccessful appeal rebuts the presumption of prejudice arising from the delay and thus negates a due process claim. Matthews v.Belton (N.D. Tex., 1999), No. 3-97-CV-1473-BD, 1999 U.S. Dist. LEXIS 1084; United State v. Wiktor (C.A. 10, 1998),146 F.3d 815, 819; Hawkins, 78 F.3d at 352. As such, since Turner's merit arguments fail, he cannot show prejudice.
 {¶ 130} Thus, even if we were to recognize a right to a speedy appeal, weighing the factors in the modified Barker
test, Turner fails to show that his due process rights were violated by the length of the appeal.
 {¶ 131} For the foregoing reasons, the judgment of the trial court is hereby affirmed.
Judgment affirmed.
Waite, P.J., and DeGenaro, J., concur.
[1] The records states that Turner waived his speedy trial rights. However, the record contains no valid waiver of speedy trial rights. The notation that states he waived his speedy trial rights is not signed by him nor does it advise him of his rights and shows that he made a knowing, voluntary, or intelligent waiver. As such, it should not be presumed that he did in fact waive his speedy trial rights (which the state agrees with).