**The PEOPLE of the State of Colorado, Plaintiff–Appellee,**

v.

**Hausua A. WHITTIKER, Defendant–Appellant.**

**No. 01CA2340.**

Colorado Court of Appeals, Div. III.

Nov. 30, 2006.

As Modified on Denial of Rehearing April 19, 2007.

Certiorari Denied April 7, 2008.

Arapahoe County District Court No. 00CR2822, Frederick B. Skillern, Judge, Anthony F. Vollack, Judge.

John W. Suthers, Attorney General, John J. Fuerst, III, Assistant Attorney General, Denver, Colorado, for Plaintiff–Appellee.

Douglas K. Wilson, Colorado State Public Defender, Karen N. Taylor, Deputy State Public Defender, Denver, Colorado, for Defendant–Appellant.

Opinion by Judge RUSSEL.

Defendant, Hausua A. Whittiker, was convicted by a jury of attempted reckless manslaughter, first degree assault, reckless second degree assault, illegal discharge of a firearm, and reckless endangerment. The trial court imposed a thirty-year sentence as follows: (1) consecutive terms of sixteen years for first degree assault and fourteen years for second degree assault; (2) concurrent terms of four years for attempted manslaughter and three years for illegal discharge of a firearm; and (3) no sentence for reckless endangerment because that conviction merged with the conviction for illegal discharge of a firearm.

Defendant now appeals the trial court's judgment of conviction. He asserts three basic contentions:

1. He has been deprived of his due process right to a meaningful and speedy appeal because the trial transcripts are inaccurate and the proceeding has been delayed for several years.

2. The judgment should be reversed for trial errors in the admission of evidence, prosecutor's argument, and jury instructions.

3. The judgment should be modified because some of the jury's verdicts are unsupported, inconsistent, and duplicative.

We evaluate these contentions in turn and affirm the trial court's judgment.

### I. Defendant's Right of Appeal

We first determine whether defendant has been deprived of the due process right to a meaningful and speedy appeal. We conclude that he has not.

### A. Pertinent Chronology

Defendant filed his notice of appeal in December 2001. This court extended the time for filing the record because the court reporter, Valeri Barnes, had been diagnosed with cancer and was unable to meet the deadline.

Other court reporters were hired to assist in completing the transcripts. However, because Barnes's notes are idiosyncratic, the reporters could not complete the necessary transcripts without her assistance. In light of the ongoing difficulties in preparing the transcripts, this court granted several more extensions of time to file the record.

In July 2003, defendant asked this court to vacate the judgment and remand his case for

a new trial. He asserted that, despite extensive efforts, it was impossible to reconstruct the record.

In September 2003, this court remanded defendant's case (along with several others for which Barnes had been the court reporter) to the trial court with orders to determine whether the necessary transcripts could be completed. Retired Supreme Court Chief Justice Anthony Vollack was appointed to oversee the cases on remand.

Justice Vollack conducted several hearings to ensure that the transcripts were in the process of being completed. Defendant's trial was transcribed with Barnes's assistance, and the pertinent transcripts were filed with this court on or before January 14, 2004.

After the transcripts were filed, defense counsel asserted that they were inaccurate and incomplete. In March 2004, this court again remanded defendant's case to the trial court with orders to determine whether the record was accurate and complete.

In April 2004, the trial court held a hearing to address the transcripts in defendant's case and other cases in which Barnes had been the court reporter. The court ruled that the defendants could have an expert court reporter examine Barnes's original notes and could then present evidence on the accuracy and completeness of the various transcripts.

In May 2004, the expert court reporter testified that Barnes's notes contained information that would enable the completion of transcripts in several cases. The expert testified that she would need more time to discover whether the notes would supply all the material that was allegedly missing from defendant's case. The court granted defense counsel's request to have the expert "and any other qualified court reporters that she can recruit" prepare the missing transcripts from Barnes's notes.

Thereafter, the court held several hearings to monitor the progress in completing the missing transcripts. Defendant's case was among the last to be completed.

In November 2005, the court found that the transcripts in five cases, including defendant's case, were "substantially complete and accurate."

Defendant's appeal was recertified by this court in January 2006. The parties completed extensive briefing in May 2006 and presented oral argument in August 2006.

### B. Meaningful Appeal

■ Defendant contends that the trial transcripts are so rife with inaccuracy that he cannot receive a meaningful appeal. We conclude that the transcripts, although flawed, are sufficiently reliable to enable intelligent review of defendant's substantive contentions.

■ Generally, a criminal defendant is entitled to a record on appeal that includes a complete transcript of the trial court proceedings. *People v. Rodriguez*, 914 P.2d 230, 300 (Colo.1996). "[T]o obtain relief on a due process claim arising from an incomplete record, a defendant must *always* demonstrate specific prejudice resulting from the state of that record." *People v. Rodriguez, supra,* 914 P.2d at 301.

Here, defendant points to the following errors or omissions:

1. The transcript does not contain page 229 of volume IX or page 115 of volume X.
2. The prosecutor appears to object to his own direct examination at page 256 of volume IX.
3. A witness's answer is incorrectly attributed to the examining attorney at page 71 of volume X.
4. Other statements are similarly attributed to the wrong speaker at page 32 of volume XI (prosecutor's statement attributed to the court), page 125 of volume XI (prosecutor's statement attributed to defense counsel), and page 5 of volume XV (defense counsel's statement attributed to the court).

We agree with defendant's observations and acknowledge that the transcript is not perfect. However, we perceive no prejudice. Defendant does not identify, and we do not find, any errors or omissions that relate to the substantive issues raised on appeal. Where errors or omissions do appear, we

have interpreted the transcript consistently with defendant's representations.

We do not believe that defendant was deprived of a meaningful opportunity to challenge the accuracy or completeness of the trial transcripts. The trial court granted defense requests for access to Barnes's original notes and for assistance of an expert court reporter. Thereafter, defendant did not request an evidentiary hearing to address the accuracy of his transcripts, nor did he request additional resources to facilitate their independent evaluation. Although defendant asserted in October 2005 that Barnes's "original transcriptions have proven to be inaccurate" (an assertion that rests largely on flaws discovered in other cases), he also stated that "additional hearings are not required." Thus, the court cannot be faulted to order a hearing sua sponte.

We therefore conclude that defendant has not been deprived of the right to a meaningful appeal. The transcripts are sufficiently complete and reliable to enable an intelligent review of defendant's substantive contentions.

### C. Speedy Appeal

■ We next consider whether defendant has been deprived of his right to a speedy appeal. We conclude that he has not been prejudiced.

■ The Due Process Clause protects a defendant's right to a direct appeal when that right is guaranteed by the state. *Evitts v. Lucey,* 469 U.S. 387, 393, 105 S.Ct. 830, 834, 83 L.Ed.2d 821 (1985). Excessive delay in the resolution of an appeal can give rise to a cognizable due process claim. *See People v. Rios,* 43 P.3d 726 (Colo.App.2001); *see also United States v. Smith,* 94 F.3d 204 (6th Cir.1996); *United States v. Hawkins,* 78 F.3d 348 (8th Cir.1996); *United States v. Luciano–Mosquera,* 63 F.3d 1142 (1st Cir.1995); *Harris v. Champion,* 15 F.3d 1538 (10th Cir.1994); *Simmons v. Reynolds,* 898 F.2d 865 (2d Cir.1990); *Rheuark v. Shaw,* 628 F.2d 297 (5th Cir.1980).

■ In *People v. Rios, supra,* a division of this court applied the constitutional speedy trial test announced in *Barker v. Wingo,* 407

U.S. 514, 92 S.Ct. 2182, 33 L.Ed.2d 101 (1972), to evaluate the due process implications of appellate delay. Under this test, courts are to consider the following: (1) the length of the delay; (2) the reason for the delay; (3) the defendant's assertion of the right; and (4) any prejudice to the defendant resulting from the delay. *Barker v. Wingo, supra,* 407 U.S. at 530, 92 S.Ct. at 2192; *People v. Rios, supra,* 43 P.3d at 732.

We agree with the division in *Rios* that *Barker* provides a workable framework and will examine defendant's claim in light of the four *Barker* factors.

### 1. Length of Delay

A defendant must make a threshold showing of inordinate delay to trigger inquiry into the remaining *Barker* factors. *People v. Rios, supra,* 43 P.3d at 732. Here, the delay is approaching five years. This delay is clearly excessive and inordinate. *See United States v. Smith, supra,* 94 F.3d at 209 (three-year delay is sufficient to trigger further inquiry); *Simmons v. Reynolds, supra* (six-year delay is excessive); *United States v. Johnson,* 732 F.2d 379, 382 (4th Cir.1984) (two-year delay "is in the range of magnitude" for triggering inquiry).

### 2. Reason for Delay

Because the delay is inordinate, we must inquire into the reason for the delay.

On remand, Justice Vollack determined that the delay resulted from the "illness of the assigned court reporter [and] the difficulty contract court reporters ... experienced in transcribing the notes." Because delays in the preparation of transcripts are generally attributable to the government, this factor weighs in defendant's favor. *See United States v. Luciano–Mosquera, supra* (delays caused by court reporters are attributable to the government).

### 3. Assertion of the Right

Although an accused person may wish to avoid trial altogether, a convicted defendant rarely has an interest in delaying the appeal. It is therefore generally appropriate to view the defendant's filing of a notice of appeal as

an assertion of the right to a speedy appeal. *See Harris v. Champion, supra,* 15 F.3d at 1563. *But see United States v. Smith, supra,* 94 F.3d at 210–11 (the defendant must specifically assert the right to a speedy appeal where he or she has been released pending resolution of the appeal). Thus, this third factor will generally weigh in the defendant's favor unless the state shows that the defendant affirmatively sought or caused delay. *Harris v. Champion, supra.*

Here, defendant filed a timely notice of appeal and actively sought relief on the grounds of delay. This factor weighs in his favor.

### 4. Prejudice

■ Prejudice is an essential element of a due process claim of appellate delay. Even if all other factors weigh in the defendant's favor, no relief will be granted unless the defendant can demonstrate prejudice. *See United States v. Luciano–Mosquera, supra,* 63 F.3d at 1158; *Harris v. Champion, supra,* 15 F.3d at 1559; *United States v. Tucker,* 8 F.3d 673, 676 (9th Cir.1993).

Courts employ two tests to evaluate the prejudicial effect of appellate delay. The choice of tests depends on the procedural context of the defendant's claim.

■ When the defendant asserts the claim in a collateral action (such as a habeas corpus proceeding) to gain temporary release pending resolution of the appeal, courts employ a modified version of the *Barker* prejudice test. Under this test, courts consider whether appellate delay has (1) resulted in oppressive incarceration, (2) caused undue anxiety and concern, or (3) impaired the defendant's ability to prosecute the appeal or to present defenses in the event of a retrial. *See Harris v. Champion, supra,* 15 F.3d at 1559; *Coe v. Thurman,* 922 F.2d 528 (9th Cir.1990).

■ When the defendant asserts appellate delay on direct appeal, along with other contentions of trial error, courts must focus on whether the delay has impaired the defendant's appeal. *See, e.g., United States v. Luciano–Mosquera, supra,* 63 F.3d at 1158. The other *Barker* prejudice factors "have little rationale" in this context, *United States*

*v. DeLeon,* 444 F.3d 41, 59 (1st Cir.2006), because they are rendered meaningless by the resolution of the defendant's substantive contentions.

If the appellate court rejects the substantive contentions, the defendant will be unable to show that he or she suffered "oppressive" incarceration or "undue" anxiety as a result of appellate delay. *See United States v. Hawkins, supra,* 78 F.3d at 351 ("Hawkins cannot show that his incarceration was oppressive if he was rightfully incarcerated."); *see also Harris v. Champion, supra,* 15 F.3d at 1566 ("[A]ny petitioner whose direct criminal appeal has now been decided and whose conviction has been affirmed is not entitled to habeas relief based solely on delay in adjudicating his or her appeal, unless the petitioner can show actual prejudice to the appeal, itself, arising from the delay.").

Conversely, if the court concludes that the defendant's substantive contentions are meritorious, the defendant will be entitled to relief, not for oppressive incarceration or undue anxiety, but because the underlying conviction is invalid. The defendant may obtain further relief by showing that appellate delay will impair his or her ability to present a defense on retrial. *See United States v. Antoine,* 906 F.2d 1379, 1384 (9th Cir.1990); *United States v. Alston,* 412 A.2d 351, 359 (D.C.1980). But this is, in effect, a speedy trial claim under *Barker. See Rheuark v. Shaw, supra,* 628 F.2d at 303 n. 8.

Here, defendant's claim of appellate delay is presented on direct appeal, along with other substantive contentions of trial error. We therefore evaluate prejudice by considering whether the delay has compromised defendant's ability to prosecute the appeal.

We conclude that defendant has not been prejudiced by the appellate delay. Defendant has not shown that the delay impaired his ability to present, or our ability to review, any specific substantive contention. Nor has he shown that a prompt resolution of his appeal would have yielded a different outcome. *Compare Simmons v. Beyer,* 44 F.3d 1160, 1170 (3d Cir.1995) (conviction reversed where thirteen-year delay effectively precluded review of defendant's contention of

racial discrimination in the selection of the jury), *with Muwwakkil v. Hoke,* 968 F.2d 284, 285 (2d Cir.1992) (thirteen-year delay in resolving defendant's state appeal warranted no habeas relief where defendant was unable to show that a prompt resolution would have yielded a different outcome).

We therefore conclude that defendant is not entitled to relief in this criminal proceeding based on the denial of his due process right to a speedy appeal.

## II. Assertions of Trial Error

We now address defendant's contentions regarding the admission of evidence, closing argument, and jury instructions. We find no basis for reversal.

### A. Identification Evidence

Defendant contends that the trial court erred by admitting suggestive and unreliable identification evidence. We perceive no error.

In challenging the admissibility of out-of-court identifications, the defendant bears the burden of showing that the procedure was impermissibly suggestive. *People v. Borghesi,* 66 P.3d 93, 103 (Colo.2003). If the defendant meets that burden, the burden shifts to the prosecution to show that the identification was nevertheless reliable under the totality of the circumstances. *People v. Borghesi, supra; Bernal v. People,* 44 P.3d 184, 190 (Colo.2002). The court must consider (1) the opportunity of the witness to view the criminal at the time of the crime, (2) the witness's degree of attention, (3) the accuracy of the witness's prior description of the criminal, (4) the level of certainty demonstrated by the witness at the confrontation, and (5) the length of time between the crime and the confrontation. *People v. Borghesi, supra,* 66 P.3d at 104 (citing *Neil v. Biggers,* 409 U.S. 188, 199–200, 93 S.Ct. 375, 382, 34 L.Ed.2d 401 (1972)).

The trial court's ruling on pretrial identification procedures is a mixed question of law and fact. We defer to the trial court's findings of historical fact, but we may give different weight to those facts and reach a different conclusion. *Bernal v. People, supra.*

### 1. Identification by S.A.

While attending a movie with a friend, defendant encountered S.A. Defendant and S.A. exchanged hostile glares. After the movie, defendant pulled his car alongside the car in which S.A. was riding and fired shots into the car, wounding two victims, L.R. and T.R.

Several days after the incident, S.A. was taken into custody for giving false information to police. At the police station, he saw a poster with defendant's picture. Later, S.A. was shown a different photograph of defendant. He then identified defendant as the shooter.

The trial court found that this identification procedure was impermissibly suggestive. However, the court concluded that S.A.'s identification was nevertheless reliable. The court found that S.A. (1) had previously met defendant, (2) had an adequate opportunity to view defendant the night of the shooting, both in the movie theater and in the theater parking lot, (3) had paid close attention to defendant, and (4) had demonstrated a high level of certainty. The court also determined that the length of time between the shooting and the identification was not so great as to render the identification unreliable.

The trial court's findings are supported by substantial evidence in the record. We conclude that, under the totality of the circumstances, S.A.'s identification was sufficiently reliable to allow the jury to consider it. *See People v. Monroe,* 925 P.2d 767, 772 (Colo. 1996) ("Juries are not so susceptible that they cannot measure intelligently the weight of identification testimony that has some questionable feature." (quoting *Manson v. Brathwaite,* 432 U.S. 98, 116, 97 S.Ct. 2243, 2254, 53 L.Ed.2d 140 (1977))).

### 2. Identification by L.R.

The trial court also admitted evidence that L.R. identified defendant as the shooter. Defendant contends that the court erred in admitting this evidence because it

was the product of an impermissibly suggestive photographic lineup. We disagree.

Before viewing the lineup, L.R. was admonished in writing that she did not have to identify anyone and should make up her own mind. The trial court reviewed the array and found that the photographs depicted individuals who were similar in race, age, hairstyle, and face size. The court concluded that the array was not unduly suggestive and did not present a substantial likelihood of irreparable misidentification.

After reviewing the photographic array and the supporting testimony, we find substantial evidence to support the trial court's findings and conclusion. Contrary to defendant's assertion, his hairstyle is not so unique as to render the lineup unduly suggestive.

### B. Gang Affiliation and Drug Use

■■■ Defendant contends that the trial court abused its discretion by refusing to grant a mistrial after witnesses referred to his gang affiliation and drug use. We find no abuse of discretion.

■■■ A mistrial is a drastic remedy that is warranted only when the prejudice to the defendant is so substantial that its effect on the jury cannot be remedied by any other means. *People v. James*, 117 P.3d 91, 95 (Colo.App.2004). The trial court has broad discretion to grant or deny a mistrial, and its decision will not be disturbed on appeal absent a gross abuse of that discretion. *People v. Abbott*, 690 P.2d 1263, 1269 (Colo.1984).

### 1. Gang Affiliation

Before trial, the prosecution indicated that it would not introduce evidence of defendant's gang affiliation. Nevertheless, this subject arose during trial:

1. During the direct examination of S.A., the prosecutor asked about a phone call that defendant had received in the movie theater. S.A. said, "He just—he kept going—he said blood a few times, but he wasn't stressing, but, like, was saying it loud to a point he wanted me to hear it." Defense counsel did not object to this answer.

2. On cross-examination, defense counsel asked S.A. why he did not tell police that he had recognized defendant as the driver of the other car. S.A. replied, "I don't want the jury to think I'm sitting here lying. The reason I said that is because there are four to five [bloods] living across the street from me—." Counsel then cut off further response.

3. Defense counsel asked S.A. whether he had lied about recognizing defendant's friend at the movie theater. S.A. replied, "I didn't mean to. It wasn't a lie. You asked me so many questions I got confused. If I knew it was [defendant's friend] this wouldn't of [sic] happened. I know [defendant's friend] is a blood and [defendant] is a blood and I would have—." Counsel then interrupted with another question.

4. After S.A. had been admonished not to refer to gangs or gang affiliation, defense counsel asked another question about the phone call that defendant had received in the theater. S.A. replied, "You told me not to get into any gang banging in here."

5. During the examination of victim T.R., the prosecutor asked about defendant's car. T.R. described the car's size, color, and model, and stated, "It was what they call a gangster car."

At various points, defendant moved for a mistrial. After considering the parties' arguments, the court denied defendant's motions. The court found that the parties had diligently tried to avoid any reference to gang affiliation. However, the court also noted that the evidence would have been relevant had it been offered for admission. The court ruled that the evidence did not warrant a mistrial because it merely suggested a reason for the animosity between defendant and S.A. and thus did not undermine defendant's theory of self-defense. The court also gave this curative instruction: "The jury is instructed that you shall disregard any testimony regarding any gang activity or gang affiliations. I ask that you not pay attention and [not] listen to that evidence."

We conclude that the court acted within the wide bounds of its discretion in refusing to grant a mistrial. We presume that the jurors followed the court's curative instruction. *People v. Copenhaver*, 21 P.3d 413, 418 (Colo.App.2000). But even if the jurors were unable to do so, the testimony was not so inflammatory as to require a mistrial. The references were largely innocuous. And in the context of this—case where it was undisputed that defendant exchanged gunfire with occupants of S.A.'s car, and where there was substantial evidence that defendant chased S.A.'s car and fired first—there is no reasonable possibility that the testimony caused the jury to convict defendant on an unfair basis.

### 2. Drug Use

■ Before trial, the court excluded any evidence that defendant was "wet"—that is, under the influence of PCP—at the time of the incident. However, the following exchange occurred when the prosecutor asked T.R. to describe a conversation that she had with defendant's friend:

Q: First off, where did it occur, specifically?

A.: No. Can I just go back a little bit? Because when we were in there when he told me about not being—that he would not have shot at us, he also said that he was off on PCP or wet or something.

Defense counsel objected, and the court sustained the objection. Later, the court denied defendant's motion for a mistrial. The court found that T.R.'s statement was not so prejudicial as to warrant a mistrial because it was not clear that defendant was the person being referred to and because there was ample evidence that the occupants of S.A.'s car were also using drugs.

The court employed these remedial measures:

1. The court instructed the jury: "[T]here was some testimony about PCP, or somebody being wet or something; that is an inference [sic], apparently, to drug usage. I've stricken that evidence from the record, and I'm instructing you to disregard it."

2. The court also read the following stipulation to the jury: "[T]he parties agree that there is no evidence that [defendant] was using any drugs on the night of the incident, October 15th, or that he was under the influence of any drugs, and you should disregard any testimony in that regard."

We conclude that, in light of the court's remedial actions, the reference to drugs was not so inherently prejudicial as to warrant a mistrial. *See People v. Lowe*, 969 P.2d 746, 751 (Colo.App.1998) (absent evidence to the contrary, the reviewing court presumes that the trial court's instructions cured any prejudice).

### C. Prior Criminality

■ The prosecution called a police detective to testify about his investigation of the crime. While describing his work, the detective stated: "Detective Wilson had got a name or nickname of somebody.... After getting the information, I contacted the Denver Police Department and learned that they had a photo of the individual we were looking for and a photo lineup was obtained for that person." Defense counsel did not object.

Defendant now argues that this testimony was an improper reference to prior criminal activity. Because defendant did not object at trial, we review only for plain error. *People v. Miller*, 113 P.3d 743 (Colo.2005).

We conclude that this statement did not so undermine the fundamental fairness of the trial as to cast serious doubt on the reliability of the conviction. The officer's statement was brief, was not stressed by the prosecutor, and did not identify any specific prior criminality.

### D. Prosecutorial Misconduct

■ Defendant contends that the trial court erred in allowing the prosecutor to engage in repeated instances of misconduct. We find no reversible error.

### 1. Cross–Examination

During cross-examination of a defense investigator, the prosecutor asked the following questions:

Q: [T]o the extent that what happened goes against the interest of [defendant], are you going to turn that information over to the prosecutor?

A: I don't turn anything over to you.

Q: And, in fact, only after the Court order did we get that from you?

A: Once the Court ordered—

At this point, defense counsel objected. The court sustained the objection and stated, "The jury should disregard."

We agree that the prosecutor's questioning was improper because it suggested that the defense may have tried to conceal evidence. But we conclude that the trial court cured any prejudice by sustaining defense counsel's objection and instructing the jury to disregard the questioning. Unless there is a showing to the contrary, we presume that the jury followed the court's instruction. *People v. Darbe*, 62 P.3d 1006, 1012 (Colo.App.2002).

### 2. Closing Argument

■ A claim of improper closing argument is evaluated in the context of the argument as a whole and in light of the evidence presented at trial. Errors in argument that do not substantially influence the verdict or affect the fairness of the proceedings may be deemed harmless. *People v. Griffith*, 58 P.3d 1111, 1113 (Colo.App.2002).

■ Defendant raises five specific contentions of error in closing argument. We consider and reject these contentions as follows:

1. Defendant contends that the prosecutor impermissibly shifted the burden of proof by stating: "[Defense counsel] talked about 10 months of preparing this case and about our burden of proof, but she chose not to put on a case. I think you would have seen that car[,] that white Regal." We conclude that the prosecutor did not shift the burden of proof, particularly because he specifically told the jury that he did not want his comments to be understood as an attempt to shift the burden. *See People v. Esquivel–Alaniz*, 985 P.2d 22, 23 (Colo.App.1999) ("[C]omment on the lack of evidence confirming a defendant's theory of the case is permissible and does not shift the burden of proof.").

2. Defendant contends that in the following comments the prosecutor misstated the law governing self-defense:

   [Defendant] did not have the right, even if [S.A.] fired first, to take those actions that he did because he started this and he brought the threat of lethal force to the victims' vehicle.

   . . . .

   And the defendant tried to retreat? We have absolutely no evidence of that, that the defendant communicated any desire to retreat.

   We conclude that the comments were proper. The prosecutor was merely advancing the theory that defendant was the initial aggressor. This theory was reasonably based on evidence presented at trial.

3. The prosecutor stated that certain offenses "do not ever have self-defense as an option to you." Defendant objected that this was a misstatement of the law, and the objection was overruled. For the reasons stated in part II.E.2 below, the error was harmless.

4. Defendant contends that the prosecutor improperly characterized defense counsel's questioning of one witness as "badgering." When viewed in the totality of the entire closing argument, this statement was harmless.

5. Defendant asserts several other alleged errors to which no objection was made. After considering these comments in context, we conclude that they did not constitute obvious and substantial error that so undermined the fundamental fairness of the trial as to cast serious doubt on the reliability of the verdict. *See People v. Miller*, *supra*.

Because the alleged errors of which defendant complains did not, singly or cumulatively, deprive him of a fair trial, he is not entitled to reversal. *See People v. Roy*, 723 P.2d 1345 (Colo.1986); *People v. Gordon*, 32 P.3d 575, 581–82 (Colo.App.2001).

## E. Jury Instructions

We next consider and reject defendant's challenges to the court's jury instructions.

### 1. Self–Defense and Multiple Assailants

■ Defendant presented evidence that the first shot had been fired from the car in which S.A. and others were riding. Relying on this evidence, defendant claimed that he had acted reasonably in self-defense against multiple assailants.

At defendant's request, the court gave the following jury instruction:

> It is an affirmative defense to the crimes of Criminal Attempt (to Commit Murder in the First Degree—After Deliberation), Criminal Attempt (to Commit Murder in the Second Degree), Assault in the First Degree, Assault in the Second Degree (Bodily Injury), and Illegal Discharge of a Firearm that the defendant used physical force upon another person
>
> 1. in order to defend himself or a third person from what he reasonably believed to be the use or imminent use of unlawful physical force by the victim, *and/or another he reasonably believes is acting in concert with the victim*
>
>    . . . .

(Emphasis added.)

Defendant also asked the court to instruct the jurors that they were required to consider "the number of persons who reasonably appeared to have been acting in concert to constitute a threat to [defendant]." The court denied this request and instead gave the jury this instruction:

> In this case, one assessment you may make is whether the Defendant reasonably believed that use or imminent use of force came from the joint action of one or more persons. If so, you can consider what reasonably appeared to be the joint actions of the other persons in assessing whether the Defendant acted reasonably.

Defendant now argues that the court's instructions were erroneous because they failed to inform the jury that it was required, and not merely permitted, to consider the evidence of multiple assailants in determin-

ing whether defendant acted reasonably. We disagree.

■ In evaluating defendant's contention, we view the jury instructions as a whole to determine whether the jury was adequately informed of the applicable law. We also consider whether defense counsel's closing argument fairly communicated the defendant's theory. *People v. Smith*, 77 P.3d 751, 756 (Colo.App.2003).

Here, the court's instruction contained the same basic elements, albeit in lesser detail, as the instruction tendered by defendant. The instruction indicated that the conduct of "one or more persons" was relevant in evaluating whether defendant acted reasonably in self-defense. The court gave other instructions reminding the jurors to consider *all* the evidence presented. And defense counsel argued to the jury that defendant reasonably perceived the danger posed by multiple assailants in the adjacent car.

In light of the court's instructions and defense counsel's argument, the jury would not have thought itself free to disregard evidence relating to defendant's theory of self-defense or the number of people that may have threatened him. Thus, the court's instructions adequately guided the jury's inquiry into whether defendant acted in reasonable self-defense.

### 2. Self–Defense and Reckless Conduct

■ Defendant contends that the trial court did not properly instruct the jury about the relationship between self-defense and charges that require a mental state of recklessness. We agree that the instructions were erroneous. Under *People v. Roberts*, 983 P.2d 11, 14 (Colo.App.1998), the jury should have been instructed to consider evidence of reasonable self-defense in determining whether defendant acted recklessly. But we conclude that the error was harmless.

The jury was instructed that it could convict defendant of first degree assault only if it found beyond a reasonable doubt that defendant had not acted in reasonable self-defense. Because the jury convicted defendant of first degree assault, it necessarily rejected defendant's theory. Therefore, defendant could not have been prejudiced by an

error in the instructions regarding the relationship between self-defense and reckless conduct. Had the jury been properly instructed, the outcome would have been the same. *Cf. Mata–Medina v. People*, 71 P.3d 973, 981–83 (Colo.2003) (failure to instruct the jury on a lesser offense is harmless as a matter of law where the jury receives an instruction on an intermediate offense and yet convicts the defendant of the greater offense).

### 3. Response to Jury Question

During deliberations, the jury submitted the following written question to the court: "We understand that a unanimous decision must occur in order to return a guilty verdict on a charge. Does a verdict of "not guilty" also require a unanimous vote for that given charge?"

The court responded, "Yes." Defense counsel suggested that the court supplement the response by informing the jurors that they need not agree on the nature of any reasonable doubt that they might have. The court denied that request.

Defendant now argues this ruling was reversible error. We disagree.

When a jury inquires about the meaning of a particular instruction, the court should provide a supplemental instruction to clarify the jury's uncertainty. *People v. Harding*, 17 P.3d 183, 186 (Colo.App.2000). The clarification should be concrete and unambiguous. *See Leonardo v. People*, 728 P.2d 1252, 1256 (Colo.1986).

Here, the court's response to the jury was concrete, unambiguous, and correct. The court was not required to answer a question that the jury did not pose.

### III. Verdicts

Finally, we evaluate three arguments regarding the integrity of the jury's verdicts. We find no reason to disturb the verdicts.

### A. Sufficiency of Evidence

Defendant contends that the evidence did not support the jury's determination that he was guilty of assault. Specifically, he argues that there was insufficient evidence of serious bodily injury. We disagree.

A challenge to the sufficiency of the evidence requires a reviewing court to determine whether the evidence, viewed in the light most favorable to the prosecution, is sufficient to support a conclusion by a reasonable fact finder that the defendant is guilty of the crimes charged beyond a reasonable doubt. *People v. Sprouse*, 983 P.2d 771, 777 (Colo.1999). Resolution of the weight and credibility of the evidence is entrusted to the judgment of the jurors. *People v. Brassfield*, 652 P.2d 588, 592 (Colo. 1982). An appellate court may not set aside a verdict merely because it might have drawn a different conclusion from the same evidence. *Kogan v. People*, 756 P.2d 945, 950 (Colo.1988).

Here, the court instructed the jury that, to find defendant guilty of assault, it must determine that defendant caused serious bodily injury to another person. Tracking the relevant statute, § 18–1–901(3)(p), C.R.S.2006, the instructions defined "serious bodily injury" as

> injury which, either at the time of the actual injury or at a later time, involves a substantial risk of death, a substantial risk of serious permanent disfigurement, a substantial risk of protracted loss or impairment of the function of any part or organ of the body, or breaks, fractures, or burns of the second or third degree.

The victims in this case were both treated for gunshot wounds to the leg. One victim sustained five wounds caused by two bullets; the other sustained two wounds from one bullet. The emergency room physician who treated the victims testified that the wounds involved a substantial risk of permanent disfigurement and that one victim required surgery and had a significant risk of serious infection. Both victims testified as to the severity of their injuries and showed their scars to the jury.

We conclude that, when viewed in the light most favorable to the prosecution, this evidence was sufficient to support the jury's determination that the victims suffered serious bodily injury.

### B. Inconsistent Verdicts

Defendant contends that the jury rendered inconsistent verdicts when it con-

victed him of both attempted reckless manslaughter and first degree assault. We disagree.

 "Generally, consistency among verdicts is unnecessary, but if an element of one crime negates an element of another crime, guilty verdicts on both crimes are legally and logically inconsistent and should not be sustained." *People v. Beatty,* 80 P.3d 847, 852 (Colo.App.2003).

To convict defendant of first degree assault, the jury had to find, among other things, that defendant, with intent to cause serious bodily injury to another person, caused serious bodily injury to any person by means of a deadly weapon. Section 18–3–202(1)(a), C.R.S.2006.

Defendant argues that the manslaughter and assault verdicts are inconsistent because he could not have engaged in the same conduct both recklessly and intentionally. We do not agree that the verdicts are inconsistent.

On the charge of first degree assault, the jury could have found that defendant intended to cause serious bodily injury to S.A. but caused such injury to L.R. *See* § 18–3–202(1)(a), C.R.S.2006. On the charge of attempted manslaughter, the jury could have found that defendant consciously disregarded the risk that either L.R. or T.R. would be killed. *See* §§ 18–1–501(5), 18–3–104(1)(a), C.R.S.2006. Defendant's intent to cause serious bodily injury to S.A. is consistent with his conscious disregard of a substantial risk that L.R. or T.R. would be killed. *See People v. McCoy,* 944 P.2d 584 (Colo.App.1996).

### C. Merger

Defendant contends that his attempted manslaughter conviction must merge with his convictions for first and second degree assault. We disagree.

We evaluate defendant's contention by comparing the statutory elements of the various offenses. If proof of facts establishing the elements of the greater offenses necessarily establishes all the elements of the lesser offense, the lesser offense is included and will merge. *See* § 18–1–408(5)(a), C.R.S. 2006; *Blockburger v. United States,* 284 U.S. 299, 52 S.Ct. 180, 76 L.Ed. 306 (1932); *People v. Leske,* 957 P.2d 1030, 1036 (Colo.1998).

Here, attempted manslaughter contains an element that is not necessarily established by proof of either first or second degree assault—namely, that defendant took a substantial step toward causing the death of another person. *See* §§ 18–2–101, 18–3–104(1)(a), C.R.S.2006; *People v. Tallwhiteman,* 124 P.3d 827, 835–36 (Colo.App.2005). Therefore, defendant's conviction for attempted manslaughter does not merge into his convictions for first and second degree assault.

Defendant also contends that his conviction for reckless endangerment must merge with his conviction for first degree assault. We do not address this contention because the trial court's judgment indicates that the conviction for reckless endangerment was merged into the conviction for illegal discharge of a firearm.

The judgment is affirmed.

Judge TAUBMAN and Judge FURMAN concur.